**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



Nov 18 2014, 10:15 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**RUTH JOHNSON**
Marion County Public Defender
Indianapolis, Indiana

**KEVIN WILD**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JAMES B. MARTIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| CHARLES TINSLEY, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1402-CR-121 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Marc T. Rothenberg, Judge
Cause No. 49G02-1203-MR-16077

**November 18, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Following a jury trial, Charles Tinsley appeals his conviction for murder[1] and claims that the State did not present sufficient evidence to negate his claim of self-defense.

We affirm.

## FACTS AND PROCEDURAL HISTORY

At around 4:15 or 4:30 a.m. on March 9, 2012, Robert Hornberger and his wife were awakened in their Indianapolis home by the sound of three gunshots, "pop pop pop," followed by a pause, and then two more. *Tr*. at 22. He got up and looked out his bedroom window on the second story of his home and saw a car across the street in Tinsley's driveway, with brake lights illuminated. Hornberger went to the first floor of his home to make sure his son was home and in bed, and then Hornberger looked out the first-floor French door windows. He saw an individual, later identified as Tinsley, wearing a gray hoodie, with the hood pulled up, walk to the end of the driveway and look both directions up and down the street. Then the individual walked back and tried to pull something from the driver's side of the car. He struggled, stopped, and walked to an area near the privacy fence or into the house. Minutes later, Tinsley returned, got into the car, and pulled out a body. Hornberger saw a tennis shoe, a leg, a torso, and the body hit the ground. Tinsley walked backwards toward his house, dragging the body by its legs. Hornberger called 911. It was 4:52 a.m. Hornberger saw the police arrive, and they were using spotlights to locate the scene. Hornberger observed Tinsley, still outside, back into the privacy fence area and close the gate.

---

[1] *See* Ind. Code § 35-42-1-1. We note that effective July 1, 2014 a new version of this criminal statue was enacted. Because Tinsley committed his crime in 2012, we will apply the statute in effect at that time.

2

At 4:54 a.m., Indianapolis Metropolitan Police Department ("IMPD") Officer Adam Mengerink responded to Stevenson Street in Indianapolis relative to a 911 call reporting "shots fired." *Tr*. at 47. When he arrived at the residence, later determined to be Tinsley's, he saw a tan four-door vehicle in the driveway. Officer Mengerink exited his vehicle and walked to the rear of the home. The garage door was closed. Officer Mengerink and IMPD Lieutenant Shephard,[2] who also was on the scene, knocked on the front door, and Tinsley answered. They asked Tinsley if he had heard gunshots, and he paused and then responded that he had heard some. Police asked Tinsley who was at home, and he told them his wife and kids were home, so police asked if they could enter and check on their welfare, and Tinsley agreed. Tinsley also told officers he was "waiting for my buddy[,] Stew." *Tr*. at 74. Tinsley's wife appeared from another room, unharmed. Lieutenant Shepherd asked Tinsley if police could go in the backyard and into the garage, at which time Tinsley stepped into the doorway to block them from making entry into the backyard and told them they would need a warrant.

At Lieutenant Shepherd's instruction, Officer Nicole Pilkington placed Tinsley in handcuffs, and other officers proceeded out the back door into the fenced backyard. The service door to the garage was partially open. Officer Mengerink went into the garage based on the 911 caller's report that a body had been dragged into the garage. As he used a flashlight to pan across the interior of the garage, he saw a handgun and holster laying on top of a bag of trash. Thereafter, he discovered a black male, later identified as Eric

---

[2] Lieutenant Shephard did not testify, and his first name is not included in the record before us.

Stewart, on the concrete floor. He was naked from the waist down and still bleeding. Officer Mengerink radioed for medics, who were already at the scene. Stewart was pronounced dead. Officer Mengerink remained in the garage area for one to two hours, to secure the scene. When Tinsley asked to use the restroom, Officer Mengerink accompanied him, and Officer Mengerink observed a pile of clothes on the floor that matched the description received in the initial 911 call. Tinsley attempted to close the door several times, but Officer Mengerink "kept opening it back up" for officer safety. *Tr.* at 63.

Search warrants and further investigation revealed that the tan car parked in the driveway belonged to Stewart's mother. Five shell casings were recovered at the scene. All came from Tinsley's FEG brand nine-millimeter Luger caliber semiautomatic handgun, which police found in Tinsley's living room, under a loveseat.

On the afternoon of March 9, IMPD Detectives Lesia Moore and Tom Lehn interviewed Tinsley. For about the first forty-five minutes of the interview, Tinsley maintained that he had not seen Stewart at all that day, had nothing to do with Stewart's death, that he had no idea how Stewart's body got into his closed garage. Tinsley stated that he sometimes purchased cocaine from Stewart and that he had planned to purchase from Stewart that day, but because Stewart did not show up, Tinsley left home about 12:00 or 1:00 a.m. and bought some cocaine from another individual known only as "Eric" at a meeting spot at 29th and California Streets. Tinsley also denied that he owned or possessed a gun.

4

Eventually, after the Detectives told him that one or more neighbors had seen him dragging the body from the car to the garage and had reported it to police, Tinsley relented, "I'm about to go down for this bullshit," and said, "Oh fuck it. . . . . It wasn't intentional." *State's Ex*. 144 at 49, 52.[3] He continued, "It was an accident, for real." *Id*. at 52. Tinsley told police that he heard the car, walked out the back door, and saw it was Stewart, still sitting in his car and parked right next to the garage. Tinsley said Stewart did not seem to recognize him at first, saying to Tinsley, "Who the fuck are you?" *Id*. at 54. Tinsley said Stewart pointed a gun at him, holding the gun with his right hand. *Id*. at 61. Stewart set down the gun on his lap or the floor, and Tinsley told Stewart, who remained seated in his car, that he had already obtained cocaine from someone else,[4] and Tinsley repeatedly told Stewart to leave, but Stewart would not. Tinsley did not want his wife to see that Stewart was there because Tinsley's wife did not approve of Tinsley using cocaine. Tinsley said the two argued through the driver's side window, which Tinsley told police was cracked open a couple of inches. Tinsley said that Stewart repeatedly made remarks such as "Fuck your wife. I'll get out and go in there and fuck your wife and your kids." *Id*. at 55. Tinsley stepped into his garage and grabbed his pistol because "I didn't know what else was gonna go on." *Id*. As Tinsley came back, Stewart opened his car door and started to step out of

---

[3] State's Exhibit 142 is the videotape played for the jury and admitted as an exhibit; State's Exhibit 144 is the transcript of the videotape, which was published to the jury to assist the jurors as they watched the videotape. Although the transcript was not admitted into evidence as an exhibit, we refer to it in this decision in order to more specifically identify at what point in the interview Tinsley made the various statements.

[4] Tinsley told police that he said to Stewart, "I'm good. Cory already took care of everything." *State's Ex*. 144 at 58. Earlier in the interview, Tinsley had told police that he met someone named "Eric" at 29th and California Streets and purchased cocaine from him.

5

the vehicle, and Tinsley saw that Stewart was holding "the damn pistol" in his left hand. *Id*. at 56. Tinsley said that Stewart "brought his hand up," which is when Tinsley shot him four or five times through the car's driver's side window. *Id*. Stewart was still seated in the car. Tinsley explained that if Stewart had shot him first, Stewart was "gonna go in there and fuck my girls." *Id*. at 87.

After he shot Stewart, Tinsley ran inside, but did not call 911 because he was "shit scared," was worried about how his wife was going to react to what just happened, and was not supposed to possess a firearm because he was a felon. *Id*. at 67. Tinsley returned to Stewart, and he dragged Stewart's body to the garage. The Detectives questioned Tinsley about how and why Stewart's pants, socks, and shoes were off when police found him, and Tinsley said they came off while he was dragging the body. Tinsley admitted to the Detectives that he removed Stewart's .40 caliber Glock handgun from Stewart's car and a small black latched box, which contained drugs, and placed them in the garage. Tinsley said he did not tell his wife about what had just occurred because she was asleep, claiming that she awoke only when the police arrived soon thereafter.

On March 12, 2012, the State charged Tinsley with (I) murder, and (II) Class B felony unlawful possession of a firearm by a serious violent felon. The State also filed a charge under Indiana Code section 34-42-1-1 for sentence enhancement for use of a firearm in the commission of a felony.

At the jury trial, Dr. Joye Carter of the Marion County Forensic Services Agency testified that six bullets were recovered from Stewart's body. Stewart suffered eight gunshot wounds, and all were on the left side of his body, including on his upper left arm,

6

the left side of his chest, and the left side of his face. Stewart's body also evidenced pseudo-stippling, caused by a debris from a secondary source, in this case, shards of glass. Dr. Carter testified that the pseudo-stippling indicates Stewart was shot within a range of three feet.

The State called Tinsley's wife, Cara, to testify. She identified the nine-millimeter handgun found under the loveseat as Tinsley's, testifying that he normally kept it in the garage and that he had possessed it for four or five years, although Tinsley had stated to Detectives that he had had the gun for "not long at all." *State's Ex*. 144 at 59. Cara did not approve of Tinsley's cocaine use, and it was causing marital discord between them. That night, she went to bed at 10:00 or 11:00 p.m., and she testified that Tinsley did not notify her that he was leaving at any point, although Tinsley had told Detectives that he told Cara at midnight or 1:00 a.m. that he was leaving briefly. Cara testified that, prior to that night, she did not know who Eric Stewart was. She stated that she did not hear any gunshots that night and only woke when Tinsley yelled to her shortly before 5:00 a.m. to "get up, get up" because police were at the home. *Tr*. at 166. Officer Pilkington's testimony noted that she stayed with Tinsley at the scene for a couple of hours, while other officers gathered information.

The State admitted photographic evidence to illustrate that the window of Stewart's driver's side window was closed when it was shot out, contrary to Tinsley's description to Detectives on March 9 that the window was cracked open a couple of inches. The State presented other evidence that revealed Tinsley used his cell phone to call Stewart a number of times that night: 1:31 a.m., 1:32 a.m., 1:35 a.m., 2:24 a.m., and 3:45 a.m., and Stewart

7

called Tinsley's cell phone at 12:15 a.m. and 3:51 a.m. The two began exchanging text messages as early at 7:24 p.m. the prior night, March 8, and they texted another eight times, with the last text being from Stewart to Tinsley at 4:31 a.m.

Tinsley testified in his defense. He explained that on the evening of March 8, he smoked some marijuana and played videogames. Stewart was supposed to come by Tinsley's house and sell him some cocaine, but when Stewart did not show up, Tinsley left sometime after midnight and purchased cocaine from another man identified as "Eric." Tinsley testified that advised Stewart that he no longer needed cocaine from him, but Stewart arrived in Tinsley's driveway anyway, sometime after 3:30 a.m. Tinsley said "What the fuck you doing here, man? . . . If my wife sees you she gonna be shitty." *Tr*. at 360, 363. Tinsley continued, "You gotta get the fuck out of here man before my wife sees you!" *Id*. at 364. Tinsley said Stewart was unusually high and, although Stewart was usually "laid back," now Stewart was more aggressive and acting "like a bully." *Id*. at 367. Tinsley told Stewart to leave a number of times, and at one point Stewart opened his door and Tinsley saw a gun in Stewart's right hand. Tinsley backed up a few feet and grabbed his own gun out of the garage, and returned to Stewart, with his gun at his side, telling Stewart that "you gotta leave for real," and Stewart replied, "Fuck [you] and fuck your wife and your little kids" and "I'll deal with them when I'm done with you." *Id*. 371. Tinsley saw Stewart raise his pistol, and Tinsley raised his and shot Stewart four or five times. Tinsley testified that he shot Stewart because was afraid of Stewart's change in demeanor, afraid for his own life, and afraid of Stewart's threat to harm his wife and kids.

8

The State cross-examined Tinsley, highlighting discrepancies, such as the fact that in the March 9 interview Tinsley said the gun was in Stewart's left hand, but during direct examination Tinsley stated it was in Stewart's right hand.[5] Tinsley also confirmed that the window of Stewart's car was cracked open a couple of inches as he and Stewart argued, and thereafter the State confronted Tinsley with the physical evidence that the window was closed when it was shattered by gunshots. Tinsley admitted that he removed a latched box out of Stewart's car, but did not know why or when he did so. The State also pointed out that a bottle of ammonia was found in or near the garage and that Tinsley had latex gloves in his back pocket when police arrived, suggesting he was planning to clean up the scene. Tinsley denied that he planned to clean up anything, and stated that he often used latex gloves to change the oil in his vehicle. *Tr.* at 399. In response to questioning, Tinsley said he dragged Stewart's body into his garage because he did not want his wife and children to have to see that. *Id*. at 379 ("getting it away from my wife and my children"). The State asked Tinsley why, if he had shot Stewart out of fear and in self-defense, he did not share this with police when they arrived at his home, asking Tinsley, "Wasn't that the time to say you were defending yourself, defending your family from somebody who was pointing a gun at you, threatening to kill you and your family?" *Id*. at 383. Tinsley replied, "I didn't think about nothing. I was just stuck. I was still high at the time." *Id*. He continued, "I just knew my wife was up and . . . she's going to be very hurt. That's all I was thinking." *Id*.

_____

[5] In later questioning, Tinsley stated, "[T]hat's when he opened the door and I see his gun in his left hand, I believe. It was something in his left hand, I know for sure." *Tr.* at 392.

After the first phase of the jury trial, the jury found Tinsley guilty of Count I, murder. Before proceeding to the second phase, on the remaining counts, Tinsley pleaded guilty pursuant to a plea agreement to Count II, possession of a firearm by a serious violent felon, which was agreed to be subject to a concurrent open sentence; in exchange, the State dismissed the sentence enhancement charge.

Following a sentencing hearing, the trial court sentenced Tinsley to fifty-seven years in the Department of Correction ("DOC") for the murder conviction and to a concurrent term of ten years on the conviction for unlawful possession of a firearm by a serious violent felon. Tinsley now appeals.

## DISCUSSION AND DECISION

Tinsley challenges the sufficiency of the evidence and contends that the State failed to negate his claim of self-defense. In order to convict Tinsley of murder, the State was required to prove that Tinsley knowingly or intentionally fired a gun against Stewart, causing his death. Ind. Code § 35-42-1-1. Tinsley asserts that, although he shot and killed Stewart, the shooting was in self-defense. Tinsley maintains that he shot Stewart "in response to his reasonable fear of serious bodily injury or death from Stewart's gun." *Appellant's Br*. at 9.

A valid claim of self-defense is legal justification for an otherwise criminal act. *Hood v. State*, 877 N.E.2d 492, 496-97 (Ind. Ct. App. 2007) (citing *Birdsong v. State,* 685 N.E.2d 42, 45 (Ind. 1997)), *trans. denied*. Indiana Code section 35-41-3-2(a) defines self-defense:

A person is justified in using reasonable force against another person to protect the person or a third person from what the person reasonably believes to be the imminent use of unlawful force. However, a person:

(1) is justified in using deadly force; and

(2) does not have a duty to retreat;

if the person reasonably believes that that force is necessary to prevent serious bodily injury to the person or a third person or the commission of a forcible felony. No person in this state shall be placed in legal jeopardy of any kind whatsoever for protecting the person or a third person by reasonable means necessary.

When a defendant raises a claim of self-defense, he is required to show three facts: (1) he was in a place where he had a right to be; (2) he acted without fault; and (3) he had a reasonable fear of death or serious bodily harm. *Hood*. 877 N.E.2d at 497. An initial aggressor or a mutual combatant, whether or not the initial aggressor, must withdraw from the encounter and communicate the intent to do so to the other person before he may claim self-defense. *Tharpe v. State*, 955 N.E.2d 836, 844 (Ind. Ct. App. 2011), *trans. denied*.

Once a defendant claims self-defense, the State bears the burden of disproving at least one of these elements beyond a reasonable doubt for the defendant's claim to fail. *Hood*, 877 N.E.2d at 497. The State may meet this burden by rebutting the defense directly, by affirmatively showing the defendant did not act in self-defense, or by simply relying upon the sufficiency of its evidence in chief. *Id.* Whether the State has met its burden is a question of fact for the fact finder. *Id.* The trier of fact is not precluded from finding that a defendant used unreasonable force simply because the victim was the initial aggressor. *Id.*

11

On appeal, Tinsley contends that the State failed to rebut his claim of self-defense. The standard on appellate review of a challenge to the sufficiency of evidence to rebut a claim of self-defense is the same as the standard for any sufficiency of the evidence claim. *Wilson v. State*, 770 N.E.2d 799, 801 (Ind. 2002); *Hood*, 877 N.E.2d at 497. We neither reweigh the evidence nor judge the credibility of witnesses. *Hood*, 877 N.E.2d at 497. If there is sufficient evidence of probative value to support the conclusion of the trier of fact, then the verdict will not be disturbed. *Id.*

Tinsley concedes that he shot and killed Stewart. In his testimony, Tinsley admitted that he "knew what [he] was doing," and that he consciously "pointed the gun and pulled the trigger." *Tr.* 376-77. He claims, however, that he did so in self-defense because he was in a place that he had a right to be, he did not provoke Stewart, and that he had a reasonable fear of serious bodily injury or death from Stewart's gun. Based on the record before us, we find that the State presented sufficient evidence to negate Tinsley's claim of self-defense.

Tinsley did not withdraw from the encounter as he was required to do as a precondition for a claim of self-defense. *Tharpe*, 955 N.E.2d at 844. To the contrary, he stepped back and got his own handgun, and returned to Stewart's vehicle. Furthermore, Tinsley's version of events was inconsistent with the physical evidence. Tinsley stated that he and Stewart were arguing through a cracked window before Stewart opened the car door, but the physical evidence of the shattered window is that the window was completely shut when it was shattered by gunshots. Stewart was shot six times, all came from the left, although Tinsley stated that Stewart was facing him, getting out of the car. Tinsley's

12

testimony was inconsistent as to whether the gun was in Stewart's left hand or right hand when Tinsley first saw it. Tinsley's conduct after the shooting also was inconsistent with his claim of self-defense. He looked up and down the street to see if anyone was around, dragged the body into his garage and closed it, did not call 911, hid the handgun inside his house, did not tell his wife, and lied to police on the scene, denying knowledge of the shooting. He further lied to police during the interview, denying that he owned a gun and claiming he had not seen Stewart in weeks. Only after he was confronted by the fact that one or more neighbors had witnessed him dragging the body did Tinsley admit to shooting Stewart. Tinsley presented his version of events, describing the words exchanged between the two men and the show of handguns, but the jury determined that Tinsley's claim of self-defense was not credible, and it rejected it. Sufficient evidence of probative value supports the jury's determination that the State negated Tinsley's claim of self-defense.

Affirmed.

BAKER, J., and ROBB, J., concur.